# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| AARON YOUNG, | Case No. 2:15-cv-3018 |
| Plaintiff, | JUDGE ALGENON L. MARBLEY |
| v. | Magistrate Judge Jolson |
| RICK CHUVALAS, et al., | |
| Defendants. | |

## OPINION AND ORDER

Aaron Young, a Muslim inmate, alleges that he was forced to attend a Christian prison ministry event at the Correctional Reception Center (CRC) in Orient, Ohio. Mr. Young now brings a claim against CRC prison officials under 42 U.S.C. § 1983, alleging that Defendants violated the Free Exercise and Establishment Clauses of the First Amendment. The matter is before the Court on the Motion for Summary Judgment of Defendants Rick Chuvalas, George Smith, Karrie Hupka, Matt Church, and Nelson Emeaghara (ECF No. 28) as well as Plaintiff's Motion to Strike Defendants' Reply Brief. (ECF No. 80). The Court heard oral argument from the parties on Thursday, May 24, 2018. (ECF No. 82). For the reasons set forth below, the Court **GRANTS** Plaintiff's Motion to Strike Part II.A of Defendant's Reply Brief and **DENIES** Defendants' Motion for Summary Judgment.

## I. BACKGROUND

### A. Factual Background

Plaintiff Aaron Young is a follower of Islam. (ECF No. 72-4). During the events at issue in this case, Mr. Young was incarcerated at CRC. (*Id.*).

1

CRC houses two types of incarcerated men: "reception inmates" who stay at the prison while they are processed and eventually moved to another institution and "cadre inmates" for whom CRC serves as their parent institution. (*Id.*; ECF No. 67-1). Typically, reception inmates and cadre inmates reside in different units, but Mr. Young participated in a program through which cadre inmates were assigned to reception units to aid reception inmates. (ECF No. 72-4). While housed in the reception unit, Mr. Young retained all of his cadre privileges. (*Id.*). Those privileges most saliently included the option to participate in recreation and programming with the cadre units and the option of spending time in other residential units rather than accompanying his reception unit to programming. (*Id.*).

In July 2015, Bill Glass Ministries – a Christian organization with a stated mission of proselytizing to imprisoned non-Christians – held an event at CRC. (ECF No. 66 at 27-31). Mr. Young first learned of the Bill Glass event when a correction officer told him that morning that attendance would be mandatory. (ECF No 72-4). Mr. Young, noting that he was Muslim and did not wish to attend a Christian event, sought to either remain in his reception unit during the event or to go to one of the neighboring reception units. (*Id.*). Although cadre inmates were typically permitted to pursue either of these options, Defendant George Smith—a Major at CRC—told Mr. Young that he "did not care" that Mr. Young was Muslim and that Warden Chuvalas had made the event mandatory. (*Id.*). Major Smith ordered Mr. Young to join the unit and threatened to send him to segregation if he failed to comply. (*Id.*).

What ensued after the Bill Glass Ministries event began is sharply disputed.

The parties do not agree as to the content of the event. Mr. Young recalls that "[t]he event felt like a church service" and that the speakers at the event told the inmates that if they "did not accept Jesus as [their] Lord and Savior" that they were "going to hell." (*Id.*) Other

2

inmates shared Mr. Young's sense that the event conveyed a religious message. (Clark Decl. ("Bill Glass people were on the microphone telling how God changed their lives, and encouraging everyone to accept Jesus as their personal Lord and Savior"); O'Neil Decl. ("The Bill Glass event felt like a church gathering.")). Defendant Deputy Warden Karrie Hupka was also at the event. (ECF No. 67-1). She recalled that representatives of Bill Glass Ministries "juggled and told jokes" before one speaker shared a story about himself, but she did not recall that the speaker mentioned God or Jesus or quoted the Bible. (*Id.*).

The parties do not agree as to whether any of the inmates were permitted to sit on the bleachers away from the event. Mr. Young recalls that he was required to remain with the crowd during the duration of the event and that he neither sat on the bleachers nor was he ever given the option to do so. (ECF No. 72-4). Major Smith, by contrast, recalls that a group of inmates, including Mr. Young, began exercising during the event. (ECF No. 67-2). He explained that he ordered the inmates to return to the crowd and prohibited them from exercising or otherwise "caus[ing] disruptions" during the event, but that when the same group of inmates eventually wandered to the bleachers about 75 yards away from the event stage, he allowed them to remain there. (*Id.*).

The parties do not agree as to what happened after the outdoor portion of the event concluded. Mr. Young declared that the inmates were not allowed to return to their cells and that they were required to remain while "Bill Glass members went around conducting prayers." (ECF No. 72-4). But Deputy Warden Hupka believes that the outdoor portion of the event concluded with a member of Bill Glass Ministries asking the inmates if they "wanted to learn about Christianity" and that those inmates who wished to do so returned to the housing unit and

voluntarily convened in a room separate from the inmates who were not interested in doing so. (ECF No. 67-1).

Finally, it is disputed whether security concerns necessitated the mandatory attendance policy. Major Smith claims that safety required "mandatory mass movement" at recreation times and that any exceptions "must be arranged with the housing unit staff in advance." (ECF No. 67-2). But Plaintiff notes that Warden Chuvalas did not make other events – such as a February 2015 event for Black History Month – mandatory for all inmates and that Defendants have "proffered no reason why a similar format could not have been provided for a visiting evangelical Christian group." (ECF No. 72 at 6).

Mr. Young filed a grievance with the Chief Inspector of Institutional Services, an Office within the Ohio Department of Rehabilitation and Correction that monitors policy compliance at Ohio correctional facilities. In August 2015, Chief Inspector Roger Wilson issued a decision on Mr. Young's grievance, which read as follows:

> In your complaint against Warden Chuvalas you allege you are a Muslim and was [sic] subjected to mandatory participation in the Bill Glass program which was a Christian event. Upon review of your complaint and applicable policies and speaking with the administration at CRC, I find that ORC policy 72-REG-01 states in part "no purely religious event shall be made mandatory.["] I further find the event was mandatory for inmates. The administration at CRC is aware of the rule and will make appropriate accommodations to ensure policy compliance.
>
> The grievance is granted.

(ECF No. 88-15).

### B. Procedural Background

On April 4, 2016, Mr. Young filed a Second Amended Complaint against CRC Warden Rick Chuvalas, CRC Major George Smith, CRC Deputy Warden of Special Services Karrie Hupka, CRC Lieutenant Matt Church, and CRC Chaplain Nelson Emeaghara under 42 U.S.C. §

1983. (ECF No. 31). Mr. Young alleges that the Defendants acted in contravention of the First Amendment to the United States Constitution by violating the Free Exercise Clause and the Establishment Clause. (*Id.*). Defendants now move for Summary Judgment on those claims, arguing that no violations occurred and that, in any event, Defendants' actions are protected by the doctrine of qualified immunity. (ECF No. 67).

After briefing on the Summary Judgment motion concluded, Mr. Young moved to strike a portion of Defendants' reply brief. (ECF No. 80).

The Court now reviews both motions.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in the non-moving party's favor. *United States Sec. & Exch. Comm'n v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citing *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). This Court then asks "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 251-52 (1986)). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

## III. ANALYSIS

### A. The Motion to Strike

As a preliminary matter, the Court considers Plaintiff's Motion to Strike. (ECF No. 80). Plaintiffs ask the Court to strike an argument that they claim Defendants raise for the first time in their Reply brief – namely, that the individual Defendants were not directly involved in the Bill Glass Ministries event. (ECF No. 80 at 2). Defendants rejoin that because Mr. Young must ultimately prove that each individual defendant took action that led to liability under § 1983, it was "reasonable" for Defendants to issue a "legal reminder" that Mr. Young cannot succeed on a theory of vicarious liability. (ECF No. 81 at 1-2).

In fact, of course, the argument contained in the Reply Brief is more than a mere "legal reminder": it is an argument connected to the facts of the case. Specifically, it is an argument that Defendants cannot be held liable because the only actions taken that potentially violated Mr. Young's rights were taken by parties other than the named Defendants. (ECF No. 79 at 2-4).

Because this argument is articulated for the first time in the reply brief, the Court declines to consider it. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("[W]e have found issues to be waived when they are raised for the first time in ... replies to responses."). As the Sixth Circuit noted, this is an issue of fundamental fairness:

> Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief-they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration. Further the non-moving party ordinarily has no right to respond to the reply brief, at least not until oral argument. As a matter of litigation fairness and procedure, then, we must treat [such issues] as waived.

*Scottsdale Insurance Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (quoting *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)). Even if the Court *were* to consider the argument, however, it is devoid of merit: it is not the mere existence of the Bill Glass ministries

event to which Mr. Young objects, it is the fact that he was allegedly forced by Defendants to attend the event. In other words, his theory of liability is direct, not vicarious.

The Motion to Strike is **GRANTED** and Part II.A. of the Reply Brief shall be **STRICKEN**. (ECF No. 79 at 2-4).

### B. Free Exercise

The Court next turns to the Motion for Summary Judgment. (ECF No. 67). The First Amendment, incorporated against the states by the Fourteenth Amendment to the United States Constitution, provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I. Mr. Young argues that the mandatory attendance policy violated both the Free Exercise Clause and the Establishment Clause of the First Amendment. (ECF No. 21). Defendants now seek summary judgment on both claims. (ECF No. 67). This Court's analysis begins with the Free Exercise claim.

To establish that Defendants violated his right to freely exercise his religion under the First Amendment, Mr. Young "must show that a governmental entity burdened the practice of his religion by preventing him from engaging in conduct mandated by his faith, without any justification 'reasonably related to legitimate penological interests.'" *Langford v. Koskela*, No. 16-1435, 2017 WL 6803554, at *2 (6th Cir. Jan. 24, 2017) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *see also Harbin–Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005). In *Turner v. Safley*, the Supreme Court articulated four factors to aid courts in ascertaining whether such a justification exists. First, "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89. "Without this, the policy is unconstitutional, and 'the other factors do not

7

matter.'" *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 646 (6th Cir. 2015) (quoting *Muhammad v. Pitcher*, 35 F.3d 1081, 1084 (6th Cir. 1994)). The Court then balances the remaining three factors together: "whether there are alternative means of exercising the right that remain open to prison inmates"; "the impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and whether there are "ready alternatives" available "that fully accommodate[ ] the prisoner's rights at *de minimis* cost to valid penological interests." *Turner*, 482 U.S. at 90–91.

Mr. Young argues that Defendants cannot satisfy even the first factor because the record reflects that CRC hosted two Bill Glass Ministries events subsequent to the July 2015 event Mr. Young was forced to attend, and that at each subsequent event inmate participation was voluntary. (ECF No. 72 at 12). Defendants contend that, to the contrary, "safety and security" necessitated that two corrections officers monitor housing units at all times, and that an inmate who chose to stay in his housing unit during a period of recreation "would require one of the two assigned corrections officers to stay with him," thereby impermissibly "leaving only one corrections officer with the rest of the housing unit." (*Id.*). But Defendants marshal no actual evidence in support of this argument. Because the burden at summary judgment is on the movant, it is difficult to conclude that the unsupported statement that the mandatory attendance policy was created "for the safety and security of the prison" (ECF No. 72 at 12) is anything other than a mere fig leaf.

Moreover, Defendants appear to ignore statements—both by prison officials and by inmates—that such a policy was not enforced either prior to or subsequent to the July 2015 event. (Church Dep. At 32:17-34:21; Clark Decl.; O'Neil Decl). It is therefore a genuine issue of

8

material fact as to whether the policy even existed in the first place, let alone whether there can ever be a valid, rational connection between such an arbitrarily enforced policy and legitimate safety and security justifications.

This friction alone produces a genuine issue of material fact such that summary judgment cannot be entered in favor of Defendants.

So, too, does examination of the other three *Turner* factors reveal that summary judgment would be inappropriate at this stage. Defendants argue that Mr. Young had alternative means of exercising his religion, "including Jumah (the congregational prayer on Fridays), Taleem (religious education and studies), individual prayer, diet, observing the Ramadan fast and the Eid feasts, and owning religious property." (ECF No. 67 at 12-13). But Mr. Young argues that his faith requires him to leave the presence of any person denying the teachings of Islam. (Young Decl.). Defendants have not adduced any evidence or testimony to suggest that CRC's respect for certain aspects of Islamic religious practice provides, in any way, an alternative avenue of exercising that particular tenet of Mr. Young's faith. Finally, as to the third and fourth factors, compelling evidence in the record suggests that Mr. Young's request to stay in his unit could have been honored at zero or *de minimis* cost to the institution. (Young Decl.; Smith Dep. At 63:1-4; Hupka Decl.).

In short, genuine issues of material fact exist as to whether Defendants violated Mr. Young's right to free exercise of his religion.

### C. Establishment Clause

Next, Mr. Young contends that Defendants violated the Establishment Clause of the First Amendment by forcing him to attend a religious event. "The Establishment Clause of the First Amendment, applied to the States through the Fourteenth Amendment, prevents a State from

9

enacting laws that have the 'purpose' or 'effect' of advancing or inhibiting religion." *Zelman v. Simmons-Harris*, 536 U.S. 639, 648–49 (2002) (quoting *Agostini v. Felton,* 521 U.S. 203, 222–223 (1997)). Under *Lemon v. Kurtzman*, "government action does not run afoul of the Establishment Clause if it (1) has a secular purpose; (2) does not have the primary or principal effect or either advancing or inhibiting religion; and (3) does not foster an excessive governmental entanglement with religion." *Am. Civil Liberties Union of Kentucky v. Mercer Cty., Ky.*, 432 F.3d 624, 635 (6th Cir. 2005) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971)). As the Sixth Circuit observed, "[i]n the years since the Supreme Court announced the *Lemon* test, the Supreme Court has refined its first two prongs. *Lemon's* purpose prong 'is now the predominant purpose test.'" *ACLU v. DeWeese*, 633 F.3d 424, 431 (6th Cir. 2011) (quoting *ACLU v. Mercer Cty.*, 432 F.3d 624, 635 (6th Cir. 2005). The second *Lemon* prong has been "reformulated as the 'endorsement test'" and "asks whether the government action has the purpose or effect of endorsing religion." *Id*. (quoting *Mercer*, 432 F.3d at 635)). The third prong "remains the excessive entanglement test." *Id.*

If the Government fails to meet any of these three prongs, the action violates the Establishment Clause. *Id.* (citing *ACLU v. McCreary Cty.,* 354 F.3d 438, 458 (6th Cir. 2010)). Genuine issues of material fact exists as to at least the first two prongs of the *Lemon* test.

### 1. Purpose Test

A government actor's stated purpose "generally get[s] deference" under the first prong of the *Lemon* test. *DeWeese*, 633 F.3d 424, 431 (6th Cir. 2011) (quoting *ACLU v. McCreary Cty.*, 607 F.3d 439, 445 (6th Cir. 2010)). "However, 'the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective.'" *Id.* (quoting *McCreary*, 607 F.3d at 445)). The Court's duty is to ascertain, from the perspective of an objective observer,

whether the government's actions, in context, suggest that the purpose of the official act was non-secular. (*Id.*).

Here, there exists a genuine issue of material fact. Defendants state that the primary purpose of the event was to provide entertainment for the inmates and "increase out-of-cell time by increasing programming for inmates." (ECF No. 67 at 14). Yet Warden Chuvalas conceded that the event was "faith-based" and that although Bill Glass Ministries events may be entertaining, the entertainment is a "strategy[y] . . . to deliver their message." (*See* Chuvalas Dep. ("Typically the organization uses strategies such as music, stand-up comedy, and motorcycle displays for inmates to view on the outside recreation yard to deliver their message.")). It is impossible at this stage to reconcile the stated secular purpose with these concessions. A jury is properly situated to determine whether an objective observer of the government's actions would conclude that the primary purpose of the event was religious in nature.

### 2. Endorsement Test

As the Sixth Circuit explained in *Mercer,* "under the endorsement test, the government violates the Establishment Clause when it acts in a manner that a reasonable person would view as an endorsement of religion. This is an objective standard, similar to the judicially-created reasonable person standard of tort.... [T]he inquiry here is whether the reasonable person would conclude that [defendant's] display has the effect of endorsing religion." 432 F.3d at 635. Stated differently, "[w]hile the first *Lemon* prong is subjective, the second is objective. It asks 'whether, irrespective of [the] government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.'" (*Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 788 F.3d 580, 587 (6th Cir. 2015) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 1984) (O'Connor, J., concurring)).

Defendants argue that there was no endorsement because "there was no coercion." (ECF No. 67 at 15). This is utterly belied by the record, including the Affidavit of Major Smith, who described participation in the event as "mandatory"—one wonders what "mandatory" means within prison walls if it does not mean "coerced"—and recalled ordering a group of inmates who left the assembly to return "to where the entertainment was taking place." (ECF No. 67-2). Defendants' assertion is also flatly contradicted by the Decision of the Chief Inspector of the Ohio Department of Rehabilitation and Correction, which concluded after an investigation and discussion with CRC officials that "the event was mandatory for inmates" and was thus in contravention of regulations governing the Department. (ECF No. 88-15).[1]

The claim that a prisoner is not "coerced" by the directive of a prison official is borderline risible. As legal scholar Robert Cover noted, "it is unquestionably the case in the United States that most prisoners walk into prison because they know they will be dragged or beaten into prison if they do not walk. They do not organize force against being dragged because they know that if they wage this kind of battle they will lose—very possibly lose their lives." Robert M. Cover, *Violence and the Word*, 95 YALE L.J. 1601, 1607–08 (1986). In other words, the position of the prisoner is one of exceptional vulnerability. The Court must therefore guard their First Amendment rights with exceptional zeal. As the Supreme Court observed in *Beard v. Banks*, to deny prisoners the opportunity to consume information—there, secular, nonlegal newspapers, newsletter, and magazines—"comes perilously close to a state-sponsored effort at

---

[1] Rule 11 of the Federal Rules of Civil Procedure provides that "[b]y presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support. . . ." Fed. R. Civ. P. 11(b)(3). Although the Court declines *sua sponte* to issue Rule 11 sanctions at this juncture, this Court would be remiss if it did not observe that Defendants' factual contention that "there was no coercion" appears to have little, if any, evidentiary support.

mind control.  The State may not 'invad[e] the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control.'"  548 U.S. 521, 552 (2006) (quoting *Wooley v. Maynard*, 430 U.S. 705, 715 (1977)).  Such reasoning applies with equal force to a circumstance such as this, in which prison officials allegedly forced prisoners to consume religious content.

Defendants argue further that "[n]o reasonable person" could conclude that Defendants were endorsing religion because "the event included secular elements."  (ECF No. 67 at 16).  It may be so that the event included secular entertainment.  But that alone does not end the inquiry.  The question is instead whether the event *as a whole*, including the requirement of mandatory attendance, would be perceived by a reasonable person as state endorsement of religion. As to that question there is there is a genuine issue of material fact.  Not only did several inmates convey that the events included a religious message (Young Decl.; Clark Decl.; O'Neil Decl.), but also Defendant Hupka herself could not say for certain whether the presentation appeared to endorse Christianity.  (Hupka Decl. "I do not recall [the presenter] mentioning God or Jesus or quoting the Bible."; "I might have stepped inside the building from time to time.")

In sum, Defendants fail to establish that they must prevail as a matter of law as to the Establishment Clause claim.

### D.     Qualified Immunity

Finally, Defendants argue that even if prison officials violated Mr. Young's First Amendment rights, Defendants are nevertheless shielded from liability because they are entitled to qualified immunity.  (ECF No. 67 at 17-20).  Under the qualified immunity doctrine, government officials are not liable for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) (internal quotations omitted)). The doctrine seeks to "balance[] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

To ascertain whether a defendant is entitled to qualified immunity, this Court considers two questions: "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," *Pearson v. Callahan* 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001), and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (citing *Saucier*, 533 U.S. at 201).

Courts must "define the 'clearly established' right at issue on the basis of the 'specific context of the case.'" *Tolan v. Cotton,* 134 S. Ct. 1861, 1866 (2014) (citing *Saucier*, 533 U.S. at 201). Because this Court must construe the alleged facts in a light most favorable to Mr. Young, it declines to define that context "in a manner that imports genuinely disputed factual propositions." *Id.* (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

Although neither the Supreme Court nor the Sixth Circuit has weighed in on the precise issue of whether prisons may make attendance at religious events mandatory for inmates, this Court may review precedent from other jurisdictions to ascertain whether clearly established law prohibits such activity. *See Key v. Grayson*, 179 F.3d 996 (6th Cir. 1999) ("there need not be a relevant decision from the Supreme Court or this court in order to determine that a law is clearly established"). And as the Ninth Circuit held in *Inouye v. Kemna*, case law on this issue is "uncommonly well-settled": courts routinely hold that prisoners and parolees cannot be forced to attend religious programs. *Inouye v. Kemna*, 504 F.3d 705, 715 (9th Cir. 2007) (citing *Warner v.*

14

*Orange County Dept. of Probation*, 115 F.3d 1068, 1074–75 (2nd Cir.1997); *Kerr v. Farrey*, 95 F.3d 472, 479–80 (7th Cir.1996); *Alexander v. Schenk*, 118 F. Supp. 2d 298, 301–02 (N.D.N.Y. 2000); *Warburton v. Underwood*, 2 F. Supp. 2d 306, 318 (W.D.N.Y. 1998); *Ross v. Keelings*, 2 F.Supp.2d 810, 817–18 (E.D.Va.1998); *Arnold v. Tennessee Board of Paroles*, 956 S.W.2d 478, 483–84 (Tenn. 1997); *In the Matter of David Griffin v. Coughlin*, 673 N.E.2d 98 (N.Y. 1996). And recently, a district court within the Sixth Circuit enjoined the State of Tennessee from requiring an inmate from attending any "religious-based training in any form." *Baker v. Tennessee*, No. 3:17-147, 2017 WL 662936, at *7 (M.D. Tenn. Feb. 17, 2017).

This body of case law is overwhelming, and a reasonable person—indeed, a reasonable prison official—surely would have known that the alleged conduct violated clearly established constitutional rights. *Cf. Pearson v.* Callahan, 555 U.S. 223, 231 (2009). Despite this, Defendants make two arguments as to why they believe it was nevertheless reasonable for prison officials to require—on pain of segregation or worse—attendance of the Bill Glass Ministries event. First, they argue, "Defendants would have no reason to suspect that bringing a group to CRC that regularly provides entertainment in prisons across the country would give rise to a constitutional claim." (ECF No. 67 at 19). This argument elides the point entirely: Mr. Young objects not to the hosting of the event, but to the mandatory nature of the event. Defendants summon no evidence to suggest that they believed other prisons required inmates to attend presentations of Bill Glass Ministries or other similarly ecclesiastical events regardless of the inmate's faith and over the express objections of the inmate.

Second, Defendants assert that making attendance mandatory was "reasonable given Defendants' interest in the safety and security of the prison" and because "the event, which was prisonwide, was the first event of this size held at CRC." (*Id.* at 19-20). Defendants address

these issues in such a cursory fashion that this Court may properly consider the arguments waived. *See Moore v. Comm'r of Soc. Sec.*, 573 Fed. Appx. 540, 543 (6th Cir. 2014) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citing *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010)). But even on the merits, both of these assertions are genuinely disputed factual propositions that are properly resolved by a jury.

## IV. CONCLUSION

The Court **GRANTS** Plaintiff's Motion to Strike Part II.A of Defendant's Reply Brief (ECF No. 80) and **DENIES** Defendants' Motion for Summary Judgment (ECF No. 67).

**IT IS SO ORDERED.**

                                                    *s/ Algenon L. Marbley*
                                                    **ALGENON L. MARBLEY**
                                                    **UNITED STATES DISTRICT JUDGE**

**DATED: June 14, 2018**